UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 08-cv-61089 – USDJ Altonaga / USMJ Rosenbaum**

| | |
|---|---|
| LISA GRAY, individually and on behalf of a class of similarly situated individuals,<br><br>*Plaintiff,*<br><br>v.<br><br>MOBILE MESSENGER AMERICAS, INC., a Delaware corporation; one or more JOHN DOES, and one or more JOHN DOE CORPORATIONS,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF
FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PETITION FOR
APPROVAL OF ATTORNEY'S FEES AND PLAINTIFF'S INCENTIVE AWARD**

Plaintiff Lisa Gray, by and through Class Counsel, respectfully moves this Court pursuant to Federal Rule of Civil Procedure 23 for an order granting final approval of the Class Action Settlement Agreement with Mobile Messenger Americas, Inc. ("Mobile Messenger"), awarding Class Counsel reasonable attorney's fees and expenses, and awarding an incentive payment to Class Representative Lisa Gray.  In support, the Plaintiff submits the incorporated memorandum of law, stating as follows:

**I.      INTRODUCTION**

This class action involves Defendants' alleged practice of selling and billing cellular telephone customers for digital and electronic products and services the customers have not authorized.  On August 5, 2008, this Court granted preliminary approval of a Stipulation of Settlement (the "Agreement') resolving claims asserted against Mobile Messenger in this and

three other related class action lawsuits currently pending in state and federal courts.[1]  In addition

to the Court-approved publication and web notice—which was supported by a targeted evolving

internet promotional campaign—the parties caused notice to be published in an additional

newspaper and directly emailed to 41,439 potential class members a copy of the Court-approved

notice.  The parties' press release and independent articles reporting the settlement have

appeared in thousands of publications across the country.  All told, the comprehensive notice

plan has been incredibly successful, generating over 60,000 visits to the settlement website and

millions of dollars in refunds to date.

Notice is now complete and the deadline for the submission of exclusions and objections

has passed.  Given the strength of the settlement, it is not surprising that the settlement has

received praise from governmental officials, including from the offices of the Florida and

Washington Attorneys General.  Also, there have been no objections from class members and

only a single opt-out.   Indeed, this incredibly strong settlement provides the class with up to $12

million of cash relief (roughly equating to the full damages allegedly owed to the class), as well

as strong injunctive relief.  All told, the settlement terms approach the best plaintiffs could have

hoped to achieve at trial and given the hurdles facing them in this litigation, the results achieved

are more than fair, adequate, and reasonable.

The only papers taking issue with the settlement come from Plaintiff's lawyers from the

unrelated *In re Jamster Marketing* MDL (the "Objectors").  As discussed in Gray's separately

filed motion to strike and her opposition to their petition to intervene, and as already

---

[1] The related class actions naming Mobile Messenger are: (a) Robert Walsh v. Mobile Messenger
Americas, Inc. and mBlox, Inc., Case No. BC 385961 (Los Angeles County, CA); (b) Jason and
Nancy Batanides v. 2WayTraffic Mobile USA, Inc. and Mobile Messenger Americas, Inc., Case
No. BC392123  (Los Angeles County, CA); and (c) Louis Jiran and Delores Gresham v. AT&T
Mobility, LLC, et al., Case No. Civ. A No. 08-00013 (N.D. Cal.).

acknowledged by at least one of the MDL Plaintiffs lawyers,[2] they have no standing to criticize the settlement, and, equally as important, misunderstand or mischaracterize the facts and the law. So as to erase any taint their objections have unfairly cast upon this settlement, Gray responds to the accusations made by the MDL Plaintiffs below.

Given the strength of the Agreement and the nearly unanimous support behind it, Plaintiff respectfully asks the Court to grant final approval. Gray further asks the Court to grant her unopposed request for attorneys' fees in the amount $1,225,000 (representing roughly 10% of the cash value for the class) and for an incentive award to Class Representative Gray in the amount of $1,000.

## II. NATURE OF THE LITIGATION

### 1. Gray's Allegations and the Claims in the Related Class Actions

This settlement brings significant relief to a defined set of wireless consumers charged for content associated with Mobile Messenger, yet represents only a fraction of the dozens of class actions that have been filed throughout the country by consumers challenging the "cramming" practices in the mobile content industry. As alleged in the Amended Complaint, though disputed by Mobile Messenger, "cramming" is the result of systematic flaws in its billing system that arose due to the rapid and largely unplanned growth of the mobile content industry and resulted in charges for mobile content that were included in consumers' cellular telephone bills allegedly without their authorization. This allegedly flawed system was developed to

---

[2] On November 14, 2008, Edelman, Combs, Latturner, & Goodwin, LLC withdrew their support of the Objectors' filings on behalf of Baron Harmon in acknowledgement that they did not have standing. (*See* Declaration of Jay Edelson ¶ 2, a true and accurate copy of which is attached as Exhibit A.) Class Counsel has made similar requests of the other Objectors (Edelson Decl. ¶ 3), who responded by asking for assurances that this settlement does not release their claims in the MDL. (Edelson Decl. ¶ 4.) Class Counsel has provided those assurances, including stating that the Parties would request the final approval order reflect that no Jamster or VeriSign marketing claims would be released. (Edelson Decl. ¶ 5.) The remaining Objectors have not responded to Class Counsel's offer to provide such assurances. (Edelson Decl. ¶ 6.)

provide for the exponential demand of consumers for mobile content.  Wireless carriers interact

with entities similar to Mobile Messenger called "aggregators" who serve as middlemen between

the mobile content providers and the wireless carriers.[3]  In addition to fostering these ties, Mobile

Messenger is responsible for the actual billing and delivery of mobile content to the consumers

via cell phone technology.

The mobile content providers charge and collect payment from their customers by having

Mobile Messenger "piggyback" those charges on the cell phone bills sent to consumers by

wireless carriers.  Both Mobile Messenger and the wireless carriers are compensated for their

services to the mobile content providers by retaining a substantial percentage of the charge for

each mobile content transaction.  Although Mobile Messenger has implemented consumer

protection protocols, Gray and the plaintiffs in the related class actions allege that its billing and

collection systems nonetheless lack sufficient checks or safeguards to prevent unauthorized

charges from being added to customers' bills resulting in damages to Gray and the Class.

Gray and the named plaintiffs in two of the related actions broadly challenged the alleged

occurrence of "unauthorized charges" for mobile content.  Gray's Amended Complaint asserts

claims on behalf of a nationwide class of wireless subscribers who suffered damages as a result

of being billed for mobile content that was not authorized.  Gray has alleged causes of action for:

(1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*, (2)

Restitution/Unjust Enrichment; and (3) Tortious Interference with a Contract.

---

[3] Specifically, Mobile Messenger is engaged in the business of providing consulting, customer
support, and premium SMS billing and reporting services to online merchants wishing to sell
mobile content or other services via mobile subscription and mobile payments.  In this sense,
Mobile Messenger is distinct from the traditional "aggregators" such as mBlox who operate in
this industry.

The *Jiran v. AT&T Mobility, LLC et. al*. action involves a subset[4] of the "cramming" flaw, the so-called "recycled numbers" charges.  The recycled numbers case addresses charges that were unauthorized by the current holder of a wireless telephone number, but were allegedly authorized by the former holder of the number before it was abandoned and "recycled" to the current owner without first being "scrubbed" clean of prior mobile content subscriptions.  The settlement would cover the claims asserted in these actions as they relate to any unauthorized mobile content associated with Mobile Messenger.

### 2.    Investigation, Litigation, & Settlement.

In 2005, Class Counsel began a wide-ranging investigation into the premium mobile content industry.  (*See* Edelson Decl. ¶ 7.)  That investigation has resulted in information gathered from over 2,000 aggrieved consumers and the consultation with retained experts regarding the structure of the mobile content industry and its inherent flaws.  (Edelson Decl. ¶ 8.)  It has lead to an exchange of information and litigation strategy with multiple governmental agencies.  (Edelson Decl. ¶ 9.)  Class Counsel has received and reviewed numerous documents produced from the Illinois, Maryland, and Florida attorney generals' offices.  *(Id.)*  Class Counsel has also had in-person meetings with both the Florida Attorney General's Office and the

---

[4] As detailed at length in Class Plaintiffs' Opposition to Objectors' Motion to Intervene, the *In Re Jamster Marketing Litigation*, MDL No. 1751, Master File No. 05-CV-0819 JM (CAB) is presently pending in the United States District Court for the Southern District of California and involves unrelated claims limited to deceptive marketing practices that:

> (i) VeriSign and Jamster defendants have falsely represented to consumers that mobile customers can get a free ring tone or other phone service by sending a message Jamster or by registering on the internet; and (ii) instead of receiving the free content, those customers then received repeated text messages from defendants for which they were charged by defendants.

(*Gray* Dkt. 28, p. 9-10.)  Mobile Messenger has not been named in the MDL, the J.P.M.L. has rejected efforts to transfer general cramming and recycled numbers cases into this MDL even where there were overlapping defendants, and Mobile Messenger has represented that it has never done any business with Jamster.  (*See Gray* Dkt. 28, p. 6, 14.)

California Public Utilities Commission ("CPUC") to discuss their relative investigations into unauthorized charges in the mobile content industry. (*Id.*) Class Counsel has additionally discussed the Mobile Messenger case (and resulting settlement) with the Washington Attorney General's office and has been invited to work on federal legislation involving the mobile content industry with members of the United States Congress. (*Id.*) The understanding of the mobile content industry in general, and with respect to Mobile Messenger specifically, subsequently borne out of Class Counsel's investigation has resulted in the instant settlement Agreement for which the parties seek final approval as well as other litigation throughout the country.

The Agreement at issue resulted from initial motion practice regarding jurisdiction. Specifically, on or about January 31, 2008, Verizon Wireless removed the initial Complaint—which had named Verizon Wireless and Mobile Messenger and had alleged only a class of Florida Verizon Wireless subscribers—to this Court asserting jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). On April 7, 2008, this Court ordered remand given the limited statewide class at issue and the lack of evidence of the amount in controversy.

Out of the briefing on the amount of controversy, Mobile Messenger and Gray began a dialogue and an exchange of information on the strengths and weaknesses of Gray's claims (both in the initial Complaint and under the federal Computer Fraud and Abuse Act, which Gray was contemplating adding) and the potential damages available to the class. (Edelson Decl. ¶ 10.) These conferences were attended by counsel and, at times by the representative parties, including Mobile Messenger's CEO. (*Id.*) Following further exchanges of information regarding figures and data Class Counsel required to estimate the class's damages, eventually the Parties began preliminary settlement discussions. (*Id.*)

On June 18, 2008, Class Counsel traveled to the offices of Sheppard Mullin Ricthter & Hampton in San Francisco, California for a formal in-person settlement meeting with Mobile Messenger's outside counsel, Vice President and General Counsel, and CEO. (Edelson Decl. ¶ 11.) As it had in previous conferences, Mobile Messenger presented further evidence in support of its claim that it has acted as an industry leader in protecting consumers from fraudulent or improper billing. (*Id*.) Conversely, Class Counsel shared its research from the dozens of similar cases it was prosecuting, as well as the results of its investigation into the industry more generally. (*Id*.) And, based on the hundreds of Mobile Messenger "customers" from which it had gathered information, Class Counsel forcefully presented its counterview as to the facts and the potential damages. (*Id*.)

The Parties ultimately reached an agreement-in-principle with regard to all aspects of class relief. (Edelson Decl. ¶ 12.) Only after such an agreement was reached did the parties discuss attorneys' fees and an incentive award. *(Id.)* In fact, a final agreement on the amount of attorneys' fees was only reached a few days prior to the execution of the settlement documents. (*Id.*)

As a result of these negotiations and as part of the agreement in principle, Mobile Messenger agreed to provide Class Counsel with expedited discovery mirroring what would have been conducted during litigation in order to further confirm and test the representations and evidence presented during the negotiations. (Edelson Decl. ¶ 13.) Specifically, Mobile Messenger produced tens of thousands of pages of documents to Class Counsel concerning its revenue and refunds, consumer protection policies (including those regarding the monitoring and review of its mobile content provider clients), and reports of consumer complaints. (Edelson Decl. ¶ 14.) Mobile Messenger also provided Class Counsel with access to its computer system

and produced its CEO for a deposition.  (*Id.*)  Unlike litigation discovery, which often may be frustrated by disagreements as to the scope of discovery or the adequacy of answers provided, this process allowed Class Counsel to understand Mobile Messenger's business practices and the amount of potential damages to the class in a significantly more efficient and less contentious manner.

As a result of the above negotiations and investigation, the parties were able to finalize the Amended Settlement Stipulation executed on July 21, 2008,[5] for which they now seek final approval.  Subsequently, Plaintiff filed an Amended Complaint asserting state and federal claims on behalf of a nationwide class and voluntarily dismissing Verizon Wireless as a Defendant.  On July 11, 2008, Mobile Messenger removed the Amended Complaint, asserting this Court's jurisdiction under 28 U.S.C. § 1331.  (*Gray* Dkt. 1.)

**3.     Defendant's Position.**

Mobile Messenger has at all times denied any wrongdoing whatsoever or that it committed any of the wrongful acts or violations of law alleged in the Complaint and Amended Complaint, in this or the related actions.  The company still contends that it has acted properly. Mobile Messenger also denies that either Gray or the proposed settlement class is entitled to any form of damages as a result of the conduct alleged in the Complaint and Amended Complaint and further dispute that, even if there was relief due to the Class, that it would not be legally responsible for anything beyond the money it retained from the allegedly unauthorized charges. Mobile Messenger further made clear that it was prepared to vigorously oppose the Plaintiff's claims through experienced counsel who promised to mount an aggressive defense.

---

[5] On August 4, 2008, at the preliminary approval hearing, the Parties advised and were granted leave from the Court to file the Amended Stipulation of Settlement, which named additional mobile content providers.  (*See Gray* Dkt. 15.)

### III.   TERMS OF THE SETTLEMENT

The key terms of the Agreement for which final approval is sough are as follows:

1.   **Class Definition.**  The settlement class is defined as:

> Wireless Subscribers Nationwide who, at any time from January 1, 2005, to the Notice Date, were billed and paid for Mobile Content associated with Mobile Messenger.  Excluded from the Class are the following:  the Defendant, the Claims Administrator, and any of aforementioned respective parent, subsidiary, affiliate or control person of the Defendant, as well as the officers, directors, agents, servants, or employees of the Defendant, any trial judge presiding over this case over any of the actions which comprise the Action and/or the Related Actions, and the immediate family members of any such Person(s).

2.   **Individual Class Member Benefits.**  Class members who submit valid claim forms by January 30, 2009 will receive a refund all unauthorized mobile content charges associated with Mobile Messenger that were billed to wireless subscribers from January 1, 2005 to August 13, 2008.  One limitation to receiving a full refund is if a particular charge was recurring on a monthly basis based on a subscription or similar arrangement, the settlement class members may only recover up to three times the amount of any such recurring charge.  These claims will be paid out of a $12,000,000 established by Mobile Messenger subject to this Court's final approval of the settlement agreement and the Effective Date of the Agreement. [6]  (*Gray* Dkt. 15, p. 7.)   Further, if by January 30, 2009, the amount of claims exceeds the settlement fund, then those settlement class members who submitted valid claims will receive the lesser of the full amount requested on the claim form or the *pro rata* amount of the settlement fund.

---

[6]  If the Court grants final approval at the December 1, 2008 hearing, the Agreement provides for the establishment of a $12 million settlement fund, as opposed to the $9 million settlement fund contemplated only if final approval was to be entered in *McFerren v. AT&T Mobility LLC,* Fulton County Superior Court Case No. 2008-CV-151322 prior to this date.

**3.       Group Relief and Additional Relief.**  In addition to the individual monetary relief to the settlement class outlined above, Mobile Messenger has also agreed to provide the following group and other relief for the benefit of the class:

             **A.       <u>Mobile Messenger Service Improvements & Assurances</u>:**  Mobile Messenger has agreed to continue and enhance its refund policy and to allow all wireless subscribers to unsubscribe from any unwanted mobile content through contacting customer service.  As part the refund policy enhancement, Mobile Messenger will contract with an independent company to perform an audit of the procedures it employs to cancel wireless subscribers' subscriptions for mobile content and to process wireless subscribers' requests for refunds of unauthorized charges.  If the audit—to be commenced after the claims deadline of January 30, 2009—reveals any systematic flaws in the above procedures, Mobile Messenger agrees to correct those deficiencies.

        In addition, Mobile Messenger will remain in compliance with the "recycled" number requirements established by the Mobile Marketing Association ("MMA"), an industry consortium with 650 members, including agencies, advertisers, hand-held device manufacturers, carriers and operators, retailers, software providers, and service providers, in effect as of the Effective Date of this Agreement.  Section 11.1 of the MMA's Consumer Best Practices Guidelines, Version 3.3, effective July 9, 2008, requires aggregators such as Mobile Messenger to maintain an effective system for managing deactivation and recycled number information supplied by wireless carriers and that such deactivation information be processed within 3 days of receipt. (*See* MMA's Consumer Best Practices Guidelines, Version 3.3, available at www.mmaglobal.com/bestpractices.pdf, last visited November 11, 2008.)

  **B.** <u>**Payment of Notice and Administrative Fees**</u>**:** Mobile Messenger has retained Rosenthal and Company as the Claims Administrator and has paid for the cost of sending the settlement class notice as well as all costs of administration currently incurred and to be incurred out of the settlement fund.[7]

  **C.** <u>**Compensation for the Class Representatives**</u>**:** In addition to any award under the Settlement, and in recognition of her efforts on behalf of the Class, Mobile Messenger has agreed that $1,000 is a fair and reasonable incentive award for Plaintiff Gray's effort serving as the class representative and that it will not object to Gray's request for such an award.

  **D.** <u>**Payment of Attorneys Fees**</u>**:** Defendant has agreed to pay Class Counsel, subject to Court approval, $1,225,000 in both attorneys' fees and for reimbursement of costs. Mobile Messenger has agreed that this amount is fair and reasonable and that it will not object to, or otherwise challenge, Class Counsel's application for reasonable attorneys' fees and for reimbursement of costs and other expenses.  Class Counsel has, in turn, agreed not to seek more than said amount from the Court and does not seek more than this amount in section VII below.

  **4.** **Release**.  Essentially, if the Court grants final approval to the settlement, Mobile Messenger, its Mobile Content Provider clients, the aggregators used by Mobile Messenger for carrier interconnections, and the wireless service providers who actually billed the wireless subscribers will each receive a release from the Class Members limited to all claims for unauthorized mobile content charges associated with Mobile Messenger.

**IV.** **THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL**

  Under Federal Rule of Civil Procedure 23(e), "[t]he court must approve any settlement, voluntary dismissal, or compromise of the claims, issues or defenses of a certified class" and

---

[7] As explained below, a subsequent dispute arose between the Parties as to whether email notice should be directly sent to putative class members.  To resolve the dispute, Class Counsel agreed to defray the added costs of this notice.

such approval may occur "only after a hearing and on finding that the settlement, voluntary

dismissal, or compromise is fair, reasonable, and adequate."  There is "an overriding public

interest in favor of settlement, particularly in class actions that have the well-deserved reputation

as being the most complex." *Access Now, Inc v. Claires Stores, Inc.*, 2002 WL 1162422 at *4

(S.D. Fla. May 7, 2002); *see also Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)[8]

(finding that "[p]articularly in class action suits, there is an overriding public interest in favor of

settlement.").  A class action settlement should be approved so long as it is "fair, adequate and

reasonable and it is not the product of collusion between the parties." *Bennett v. Behring Corp.*,

737 F. Supp. 982, 986 (11th Cir. 1984); *Cotton*, 559 F.2d at 1330.  When conducting its review,

the Court "should always review the proposed settlement in light of the strong judicial policy

that favors settlements." *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1329 (S.D. Fla. 2001).

Whether a settlement is "fair, adequate, and reasonable," is determined by the Court's

consideration of the following six factors:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the
> point on or below the range of possible recovery at which settlement is fair,
> adequate and reasonable; (4) the complexity, expense and duration of litigation;
> (5) the substance and amount of opposition to the settlement; and (6) the stage of
> proceedings at which the settlement was achieved.

*Bennett*, 737 F. Supp. at 986; *see also Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314-

15 (S.D. Fla. 2005).  In its consideration of these factors, the Court "should be hesitant to

substitute . . . her own judgment for that of counsel." *In re Smith*, 926 F.2d 1027, 1028 (11th Cir.

1991); *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1320 (S.D. Fla. 2007).  In

addition, "[T]he judge must guard against the temptation to become an advocate—either in favor

of the settlement because of a desire to conclude the litigation, or against the settlement because

---

[8] All decisions of the Fifth Circuit Court of Appeals decided prior to close of business on
September 30, 1981 have been adopted as binding precedent in this Circuit. *Bonner v. City of
Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

of the responsibility to protect the rights of those not parties to the settlement." *In re Smith*, 926 F.2d at 1028; *Figueroa*, 517 F. Supp. 2d at 1320 (both cases quoting Manual for Complex Litigation (2d) § 23.14 at 160 (1986)).

In sum, the Court engages in a two-prong analysis to determine whether or not grant final approval considering: (1) whether the settlement was the result of arms-length bargaining or the product of collusion between the parties; and (2) whether the application of the *Bennett* factors show the settlement to be fair, adequate, and reasonable. *See Lipuma*, 406 F. Supp. 2d at 1315.

1.    **The Agreement is Procedurally Fair and the Product of Informed Arms-Length Negotiations.**

In assessing the procedural fairness of a class action settlement, "the Court must determine if the settlement 'was achieved through arms-length negotiations by counsel with the experience and ability to effectively represent the class's interests.'" *Figueroa*, 517 F. Supp. 2d at 1321 (quoting *Becher v. Long Island Lighting Co.*, 64 F. Supp. 2d 174, 178 (E.D.N.Y. 1999)); *see also Knight v. Alabama*, 469 F. Supp. 2d 1016, 1031 (N.D. Ala. 2006) (finding that the court must address whether settlement was product of collusion).

In this case, the Agreement was reached only after several rounds of settlement discussions, including an in-person meeting, and only after the review of thousands of pages of documentation and the deposition of Mobile Messenger's CEO. (Edelson Decl. ¶¶ 10-14.) Class Counsel brought to these settlement discussions knowledge and expertise developed through its in-depth investigation into the mobile content industry, its analysis of thousands of complaints from aggrieved customers (hundreds of whom claimed they incurred unauthorized charges associated with Mobile Messenger), and an exchange of information with wireless providers, content providers, aggregators, attorney generals, and the CPUC. (Edelson Decl. ¶¶ 8-9.) In addition, Class Counsel refused to negotiate the issue of attorney's fees or incentive awards until

after an agreement in principle as to class relief to the Class was reached and a process for confirmatory discovery was established. (Edelson Decl. ¶ 12.)

Finally, Class Counsel are respected members of the legal community, have regularly engaged in major complex litigation, and have had extensive experience in consumer class action lawsuits involving cellular telephone technology that are similar in size, scope and complexity to the present case. (Edelson Decl. ¶ 15.) In fact, Class Counsel have secured settlements in several nationwide class actions involving unauthorized cell phone charges, including recently receiving final approval of the first class action settlement involving "cramming" allegations involving a single content provider in the United States. *(Id.)*

Accordingly, the Agreement was reached by experienced Class Counsel who were adequately informed to effectively represent the interests of the class. *See Lipuma*, 406 F. Supp. 2d at 1316-1317 (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991) (finding that plaintiff's counsel were adequately informed of the strength of the claims as a result of evidence obtained through informal discovery)).

### 2. The Agreement is Substantively Fair, Adequate, and Reasonable Under the *Bennett* Factors.

#### A. The Likelihood of Success at Trial

Under *Bennett*, the Court's first consideration is the Plaintiff's likelihood of success at trial. 737 F.2d at 986. "The likelihood of success on the merits is weighed against the amount and form of relief contained in the settlement." *Lipuma*, 406 F. Supp. 2d at 1319. Indeed, the first *Bennett* factor is the most important and requires the strength of the Plaintiff's case on the merits be weighed against the value of the settlement. *See Figueroa*, 517 F. Supp. 2d at 1323-24.

Class Counsel believes that the Plaintiffs' claims in this matter—and the Related Cases encompassed by the Agreement—are strong and that ultimately the Plaintiffs would prevail on

the merits at trial.  (Edelson Decl. ¶ 16.)  The linchpin of the Plaintiffs' claims in these cases is that systematic flaws in Mobile Messenger's billing system arose due to the rapid and largely unplanned growth of the mobile content industry and has resulted in charges for mobile content being included in consumers' cellular telephone bills that were not authorized.  While the essence of Plaintiffs' claims are simplistic, the evidence and expert opinions required to substantiate those claims and the resultant damages would be highly complex.

Specifically, Gray's Amended Complaint asserts claims on behalf of a nationwide class of cell phone service consumers alleging thee causes of action.  Proving a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et. seq*. would require Plaintiff to demonstrate that the consumers cellular phone are "computers" under the act, that the transmission of unauthorized SMS text messages and their resultant charges impair the availability of class members to access and communicate with the wireless service, and that the these charges and their payment constitute "damage" and "loss," respectively.  *See* 18 U.S.C. § 1330(e)(8), (11).  Plaintiff would be required to put forth, *inter alia*, expert testimony on the capabilities of numerous types of cell phone and other handheld devices, the technical protocols of SMS transmission standards, the structure of Mobile Messenger's billing and authorization systems, and the damages caused by such practices.

Perhaps slightly easier to establish factually will be Plaintiff's Restitution/Unjust Enrichment and Tortious Interference with a Contract claims.  Each of these claims requires that Plaintiff establish Mobile Messenger knew of the flaws in its systems that resulted in the unauthorized charges at issue.  However, Mobile Messenger has at all times denied these allegations and its CEO was adamant in his deposition that adequate consumer protection policies are in place to prevent any such charges.  (Edelson Decl. ¶ 17.)

In addition to the evidentiary hurdles present in proving the above claims, these claims are untested and Mobile Messenger has indicated that it would assert numerous legal challenges and defenses absent a settlement.  In Class Counsel's opinion, several of these challenges created legitimate risks to the litigation, most notably defenses based on *quantum meruit* and voluntary payment, and claims that the class members were required to individually arbitrate these issues under carrier service agreements.  (Edelson Decl. ¶ 18.)

Given these hurdles and untested nature of Plaintiff's claims, the result obtained through the parties' agreement is extraordinary.  Class members who submit claims by January 30, 2009 will receive full reimbursement of all allegedly unauthorized charges—subject to a three-month limit on charges arising from a subscription—or their *pro rata* share of a common fund of $12 million if the number of claims exceeds the fund.  The service improvements and assurances provided in the settlement also substantially fulfill the lawsuit's purpose of addressing the charging of wireless consumers for services they did not authorize.  The audit of the procedures used to cancel subscriptions for mobile content and to request refunds of unauthorized charges will curb the damages associated with any future unauthorized charges.  Likewise, compliance with the MMA recycled numbers guidelines should substantially reduce such charges.

Accordingly, the Plaintiff's have alleged strong, but untested claims, which are subject to numerous potential defenses.  As such, the Plaintiff's likelihood of success on the merits is uncertain and the value of the settlement is unquestionably strong in comparison.

**B.**      **Range of Possible Recovery and the Point on or Below the Range of Possible Recovery at Which the Settlement is Fair.**

The next two *Bennett* factors, the analysis of which are often combined, require the Court to determine "the range of possible recovery and the point on or below the range at which a

settlement is fair, adequate and reasonable." *Lipuma*, 406 F. Supp. 2d at 1322.  As in most

litigation, "[t]he range of potential recovery spans from a finding of non-liability through varying

levels of injunctive relief, in addition to any monetary benefits to class members." *Figueroa*,

517 F. Supp. 2d at 1326 (citing *Lipuma*, 406 F. Supp. 2d at 1322) (internal quotation omitted).

The potential recovery under consideration is the possible recovery at trial.  *Lipuma*, 406 F.

Supp. 2d at 1322.  However, "the Court's role is not to engage in a claim-by-claim, dollar-by-

dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Figueroa*, 517 F.

Supp. 2d at 1326.  Finally, "[a] settlement can be satisfying even if it amounts to a hundredth or

even a thousandth of a single percent of the potential recovery." *Behrens v. Wometco Enter.

Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988).

    In contrast to a settlement that provides fractional recovery, the present Agreement

affords class members full cash refunds and includes provisions designed to curb the occurrence

of such unauthorized charges in the future.  The negotiated $12 million dollar settlement fund

was determined by the following calculus:  (1) Mobile Messenger provided the gross top-line

revenue generated by mobile content associated with it and the total amount of refunds that had

already been voluntarily paid by either Mobile Messenger or the wireless service providers

through normal customer service; (2) Class Counsel's investigation, consultation with experts,

and verification through industry reports have determined that, industry-wide, the average

amount of unauthorized charges is approximately twenty percent; (3) Class Counsel then took

this number and adjusted for the amount of refunds previously provided and the frequency and

content of Mobile Messenger-specific complaints and other information gathered as a result of

its investigation and the negotiations process.[10]  (Edelson Decl. ¶ 19.)

---

[10] Based on this analysis, Class Counsel calculated the potential damages, excluding interest and
the possibility of punitive damages (which Class Counsel believed to be exceedingly unlikely in

As discussed above, there are only two limitations to the full refunds afforded members of the class.  First, there is a three-month cap on *each* refund of allegedly unauthorized charges billed by subscription.  This negotiated cap is a recognition of a possible voluntary payment doctrine defense and recognition of the reality that at some point class members had an obligation to notice the charges on their wireless bill and cancel the subscription.  The second limitation is that if the amount of claims filed by January 30, 2009 exceeds the $12 million fund, class members will receive their *pro rata* share of the settlement fund in lieu of full relief.  Class Counsel, however, accounted for the slim possibility that its experts and investigation yielded an estimated percentage of unauthorized charges below the true amount and included a provision in the Agreement that allows for the Plaintiff to terminate the settlement if the amount of claims filed exceeds 150% of the settlement fund.  (*See Gray* Dkt. 15, § X-C.)

In addition to the amounts paid through the formal claims process—as anticipated in reaching the Agreement—wireless carriers have refunded approximately $4,204,000 in allegedly unauthorized charges for mobile content associated with Mobile Messenger.  (Declaration of Alan Sege, ¶ 4, a true and accurate copy of which is attached as Exhibit B.)  These amounts will ultimately be passed on to Mobile Messenger in the form of charge-backs.  (*See id*.)  Additionally, since notice to the proposed class began pursuant to the Settlement on or about August 13, 2008, Mobile Messenger has, through its customer service representatives, refunded $13,142 to class members for charges for mobile content associated with Mobile Messenger that were claimed to have been unauthorized.  (Sege Decl. ¶ 5.)  The total relief to the class, however, will not be determined until the end of the claims period, which is 60 days following final approval.

this case) to be approximately $12 million.  Class Counsel explained to Mobile Messenger that this number was both its starting and ending point in the negotiations.  (Edelson Decl. ¶ 20.)

All told, the relief provided approaches the best plaintiffs could have hoped to achieve at trial. Although success at trial may have provided for additional relief, such as interest, the terms of the Agreement are in the upper range of what is fair, adequate, and reasonable.

## C.   The Complexity, Expense, and Duration of the Litigation.

The next *Bennett* factor the Court must consider is the complexity and expense of litigating of this matter. *Bennett*, 737 F.2d at 986. "The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, it has been held proper to take the bird in hand instead of a prospective flock in the bush." *Lipuma*, 406 F. Supp. 2d at 1323 (citing *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993); *see also In re Domestic Air Transport.*, 148 F.R.D. 297, 306 (N.D. Ga. 1993) (noting that with a settlement, the class members are ensured a benefit as opposed to the "mere possibility of recovery at some indefinite time in the future").

In the absence of the Agreement, it is certain that the expense, duration, and complexity of the protracted litigation that would result from the nature of the Gray's Amended Complaint would be substantial. As noted above, significant costs would be incurred were this matter to proceed to trial including expenses for expert witnesses, technical consultants, and the myriad of other costs necessitated by the trial of a class action. Further, evidence and witnesses from across the country and abroad would have to be assembled. Given the complexity of the issues and the amount in controversy, the defeated party would likely appeal. As such, the extraordinary relief provided to the class under the Agreement weighs heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and appeal.

**D.**     <u>The Substance of Amount of Opposition to the Settlement</u>

The class members' reaction is an important factor in the Court's determination of the fairness, adequacy, and reasonableness of the settlement. *Bennett*, 737 F.2d at 986; *Lipuma*, 406 F. Supp. 2d at 1324. The Court may infer from the absence of objections that the majority of the class found settlement to be reasonable and fair. *Allapattah Serv., Inc. v. Exxon Corp.*, 2006 WL 1132371 at *13 (S.D. Fla. April 7, 2006).

In this case, the court-approved notice procedures utilized by the parties yielded no objections and only one request for exclusion and as such weighs in favor of final approval of the settlement. *See Access Now, Inc.*, 2002 WL 1162422 at *8 (granting final approval to class action settlement agreement where despite the comprehensive notice procedures employed, no objections to the settlement were filed); *see also Francisco v. Numismatic Guaranty Corp. of Am.*, 2008 WL 649124 at *5 (S.D. Fla. Jan. 31, 2008) (entering final approval of a class action settlement where there were no filed objections and only two class members opted out).

Additionally, this settlement has received informal praise from numerous governmental agencies that have launched investigations into the mobile content industry in general and Mobile Messenger specifically, including the Florida Attorney General's office. (Edelson Decl. ¶ 21.)

And although a group of plaintiff's attorneys prosecuting separate claims in *In Re Jamster Marketing Litigation*, MDL No. 1751, have filed papers challenging the settlement, as discussed in Gray's separately filed motion to strike and response to their petition to intervene, the Objectors have no standing or interest at stake to be challenging the settlement. Further, as discussed in detail below, despite the energy of their arguments, each is misinformed and should

give the Court no concern as to the strength of this settlement.  The lack of any legitimate opposition to the settlement further tips the scale in favor of its approval.

### E.      The Stage of Proceedings at which the Settlement was Achieved

The final *Bennett* factor requires an evaluation of the stage of the litigation at which the settlement was achieved to ensure that Class Counsel had access to sufficient information concerning the merits of the case to properly analyze the benefits of settlement over continued litigation.  *Lipuma*, 406 F. Supp. 2d at 1324 (citing *Behrens*, 118 F.R.D. at 544).  Although the Court favors early settlement, *Lipuma*, 406 F. Supp. 2d at 1324, the parties must have expended sufficient effort analyzing the issues at stake in the litigation.  *Assoc. for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 470 (S.D. Fla. 2002).   Not only is early settlement favored by the Court, but informal discovery is preferred over vast formal discovery:

> [Courts] have often seen cases which were 'over discovered.' In addition to wasting the time of [the] Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a vehicle to harass a party. Discovery in its most efficient utilization should be totally extra-judicial. . . .   Being an extra judicial process, informality in the discovery of information is desired.

*Lipuma*, 406 F. Supp. 2d at 1324 (quoting *Cotton*, 559 F.2d at 1332).

In this case, the settlement was not finalized until Class Counsel engaged in extensive investigation into the claims and defenses and were able to reasonably evaluate the merits of the Plaintiff's claims.  *Lipuma*, 406 F. Supp. 2d at 1325 ("the proposed settlement was achieved early in the litigation, but not so early that Class Counsel did not have sufficient information to negotiate with.")  Class Counsel were able to quickly secure such a favorable settlement as a result knowledge of the industry gathered through the similar lawsuits they pursuing against other entities in the mobile content industry, their having obtained and shared information with numerous governmental agencies, and their lengthy investigation into Mobile Messenger, which

included gathering information from hundreds of aggrieved Mobile Messenger consumers.  As

such, the *Bennett* factors show that the Agreement is fair, reasonable, and adequate.

## V.     THE NOTICE PLAN DIRECTED TO THE CLASS COMPORTS WITH DUE PROCESS

Contrary to the inaccurate impression the Objectors' lawyers attempt to create in their

papers, the Class was provided notice above-and-beyond the plan initially approved by the Court

and was the best possible notice under the circumstances.  Rule 23 requires the class receive "the

best notice practicable under the circumstances, including individual notice to all members who

can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2).  Further,

> [t]he notice sent to class members must inform them whether claims like theirs
> were litigated in the earlier action. In addition, the class members' substantive
> claims must be adequately described and the notice must also contain information
> reasonably necessary to make a decision to remain a class member and be bound
> by the final judgment. In reviewing the class notice to determine whether it
> satisfies these requirements, we look solely to the language of the notices and the
> manner of their distribution.

*Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1285-86 (11th Cir. 2007) (internal

citations and quotations omitted).  As the Court determined at preliminary approval and as

further demonstrated below, Due Process was complied with in all respects.

As set forth in the Amended Complaint, Mobile Messenger does not have a direct

relationship with any of the wireless carriers that bill and have access to customer information—

the *only* information it needs to process transactions relating to the Class are the customers' cell

phone numbers.  (*See Gray* Dkt. 3, Ex. 1 ¶¶ 11-12.)  In light of the issues present when only

potential class members' cell phone numbers were known, the Parties retained Rosenthal and

Company ("Rosenthal"), a professional Claims Administrator specializing in administering and

marketing class actions.  (*See* Declaration of Daniel Rosenthal, ¶¶ 1-4, a true and accurate copy

of which is attached as Exhibit C.)  After being apprised of the nature of the mobile content

industry, the claims asserted in the litigation, and the limited knowledge of the true identities of potential class members, Rosenthal developed a comprehensive notice plan specifically designed to reach as many members of the class as possible.

Initially, the notification plan created by Rosenthal and approved by the Court included: (1) a published notice in the major market newspaper in each of the top ten metropolitan statistical areas (based on total population); (2) the publication nationally in *USA Today* and *Rolling Stone* magazine; (3) a press release; and (4) internet advertising promoting the settlement website.  (Rosenthal Decl. ¶ 5; *Gray* Dkt. 16, ¶¶ 10-11.)  Each aspect of the notice plan was specifically included so as to reach as many potential class members as possible.

Pursuant to this Court's Order directing notice, on August 13, 2008, the Court approved "long form" notice was published to the Internet by Rosenthal at www.cellphonedownloads. class-action-admin.com.  (Edelson Decl. ¶ 22; *Gray* Dkt. 16, ¶¶ 10-11.)  The additional court approved summary notices, disseminated in the manner described below, all directed the recipients to visit the website or to contact Rosenthal or Class Counsel for complete settlement information.  (*See* Rosenthal Decl. ¶ 7.)

The broad publication notice to the class consisted of running 1/8th page advertisements in eleven major publications and a 1/4 page ad in a popular national periodical.  (Rosenthal Decl. ¶¶ 6-7.)  The twelve selected publications were:  the *Miami Herald*, *New York Daily News*, the *Los Angeles Times*, the *Chicago Sun-Times*, the *Philadelphia Inquirer*, the *Houston Chronicle*, the *Dallas-Fort Worth Morning News Star Telegram*,[11] the *Washington Post*, the *Atlanta Journal-Constitution*, the *Boston Globe*, *USA TODAY*, and *Rolling Stone* Magazine.  (Rosenthal

---

[11] Although included in the initial notice plan developed by Rosenthal, the Dallas-Fort Worth Morning News Star Telegram was inadvertently omitted from the list of publications included in both Plaintiff's Motion for Preliminary Approval and the accompanying proposed order submitted to this Court.  (Edelson Decl. ¶ 23.)

Decl. ¶ 6.)  The newspapers in the top ten metro areas were chosen to add media weight to the base of national publications.  (Rosenthal Decl. ¶ 5.)  For the two national publications, USA Today was chosen as the national newspaper with the broadest consumer appeal, and Rolling Stone was selected as a magazine with broad appeal to a younger audience.  (*Id.*)  These publications have a combined total readership of 30.6 million adults, which is a reach of 13.3% of adults nationwide and in the top ten metro areas selected, the reach of all adults is even greater at 28.1%.  (Rosenthal Decl. ¶ 6.)  The approved summary notice was published in the major market newspapers and USA Today on September 3, 2008.  (Rosenthal Decl. ¶ 7.)  The summary notice was also published in the October 2, 2008 issue of the Rolling Stone.  (*Id.*)

Subsequent to establishing the settlement website, Rosenthal distributed a press release— the text of which was negotiated and agreed-upon by the Parties and included the web address of the settlement page—via the Business Wire National Circuit on August 13, 2008.  (Rosenthal Decl. ¶ 8; Edelson Decl. ¶ 24.)  Business Wire posts full-text news releases to major Internet portals, search engines, web sites, financial services and database systems.  (Rosenthal Decl. ¶ 8.)  Business Wire news is also carried by major syndicators and is posted to industry, newspaper and other targeted websites providing comprehensive direct reach to consumers, investors, media and other target audiences.  (*Id.*)  The average national distribution reaches approximately 25,000 destinations, which include internet sites, trade publications, newspapers, broadcasting stations and wire services.  (*Id.*)  Some of the outlets to publish the press release included:  Reuters, Wall Street Journal's Market Watch, the Financial Times, and Yahoo! Finance.  (Edelson Decl. ¶ 25.)

In addition to the coverage generated by the press release, Rosenthal's notice plan also included $25,000 for a unique targeted internet advertising plan promoting the settlement web site.  Before committing the entire $25,000 for internet advertising, Rosenthal tested the

effectiveness of three different Internet advertising approaches:  (1) a keyword search campaign using the key words and phrases related to the settlement; (2) a content campaign, using the key words and phrases related to the settlement to determine the sites on which text ads and banners would be placed; and (3) a content campaign using categories related to the settlement. (Rosenthal Decl. ¶ 9.)  A keyword search campaign involves using the words that people enter into their Google search box and results in that person being brought to a list of links related to the search terms.  (*Id.*)  The advertiser pays for placement on the list of links, and the more that is paid for a keyword, the higher on the list the advertiser's link will be.  (*Id.*)  A Content Campaign, in contrast, places the links (text ads and image ads) on websites that have content related to the categories specified by the advertiser.  (*Id.*)  After a week of testing, Rosenthal determined that the content campaign approach was far superior and planned for the budget to be spent on content campaigns using the two different categories of terms and phrases.  (*Id.*)  As of November 5, 2008, the Internet advertising has generated 176,038,372 impressions.[12]  (*Id.*)

Rosenthal developed, and Class Counsel's Motion for Preliminary Approval sought confirmation of, the above notice plan believing at the time this was the best possible way to give notice to a class of individuals who could not be specifically identified and individually contacted.  However, during the course of confirmatory discovery and discussions with Mobile Messenger, it was discovered that embedded in Mobile Messenger's computer system were approximately 85,000 email addresses belonging to any consumer who had ever contacted Mobile Messenger.  (Edelson Decl. ¶ 26; *see also* Sege Decl. ¶ 7.)   Although Mobile Messenger maintains that it is unlikely that a significant number of these email addresses belong to

---

[12] An impression is the number of times an ad is displayed on Google or on sites or products in the Google Network, sometimes considered the number of times someone "saw" the ad. (Rosenthal Decl. ¶ 9.)

settlement class members, further negotiations with Class Counsel resulted in Mobile Messenger agreeing to manually "cut and paste" every address it had into a list to be provided to Rosenthal.[13]  (Edelson Decl. ¶ 27; *see also* Sege Decl. ¶¶ 7-8.)

On September 23 and 25, 2008, Mobile Messenger sent 84,368 email addresses of potential class members to Rosenthal.  (Rosenthal Decl. ¶ 11.)  Upon receipt, Rosenthal removed the duplicate and invalid email addresses, leaving 39,868 valid unique email addresses that could be used to send a court-approved notice.  (*See id.*)  On October 7, 2008, email notification substantially in the form of the long form notice was sent to these 39,868 email addresses.  (Rosenthal Decl. ¶ 11.)  On October 10 and 13, 2008, Mobile Messenger discovered and provided to Rosenthal an additional 2,219 customer email addresses.  (Rosenthal Decl. ¶ 12.)  After removing the duplicate and invalid email addresses, there remained 1,571 valid unique email addresses that could be used to email notice, which occurred on October 15, 2008.  (Rosenthal Decl. ¶ 12.)  Altogether, email notice was sent to 41,439 Mobile Messenger customers, of which 3,754 were undeliverable, netting 37,685 emails delivered to potential class members.  (Rosenthal Decl. ¶ 13.)

The reach of the emails delivered to Mobile Messenger customers combined with the published notices is approximately 55% in the top ten metro areas and approximately 43% in the remainder of the country.  (Rosenthal Decl. ¶ 14.)  Although not tracked, the articles that resulted from the press release and the impressions delivered by the Internet advertising conservatively adds another 5% to 10% or more reach to each of these figures.  (*Id.*)  As of November 5, 2008, the notice plan had resulted in 60,583 visitors to the settlement website.  (Rosenthal Decl. ¶ 10.)

---

[13] Mobile Messenger took the position that providing notice to these email addresses would result in unnecessary expense outside of the negotiated Agreement.  As a compromise, Class Counsel agreed to be responsible for the added costs charged by Rosenthal if Mobile Messenger would take on any internal associated costs in compiling the emails.  (Edelson Decl. ¶ 27.)

In conclusion, the notice plan utilized in this matter comports with Rule 23, with Due Process, and is more substantial than similar plans used in analogous class action settlements. *See In re Sony SXRD Rear Projection Television Class Action Litig.,* No. 06 Civ. 5173, 2008 WL 1956267, at *4 (S.D.N.Y. May 1, 2008) (granting final approval of class action settlement with estimated 172,000-175,000 members and where notice was provided directly to approximately 40% of class as contained in defendant's records and was supported by publication and a settlement website).

### 1.    The Objections to Notice are either Misinformed, Fabricated, and/or Without Merit

Despite the expansive notice plan detailed above, the Objectors have made either misinformed or entirely fabricated attacks on the manner and content of the notice approved by this Court.  (*See Gray* Dkt. 25.)  Specifically, the Objectors contend that:  (a) the publication notice was inadequate because individual notice is required to a claimed list of people allegedly held by Rosenthal; (b) that the issuance of a press release is somehow improper; (c) the internet advertising has no set requirements for Rosenthal to follow and no requirement Rosenthal actually spend the clearly allotted $25,000 on such advertising; (d) the notice does not state that AT&T Mobility was partially enjoined from proceeding with a narrow set of claims having no bearing on the present suit; and (e) the notice make it impossible for persons to determine if they are a member of the class.  (*Id.*)  Not one of these or the other objections should distract the Court from the demonstrated truth about the strength of the notice plan.

### A.    Individual Notice was Given to All Ascertainable Persons and Publication was Otherwise Proper

The first, and hence presumptively strongest, of the MDL Plaintiff's objections to the instant settlement is unfair because there was no individual notice despite Rosenthal's access to a

"list" and that the publication notice utilized was too limited.  However, both arguments are based on misinformed statements about the scope of the notice and an invented claim by the Objectors' counsel that Rosenthal possesses a list of potential class members.

The Objectors overlook that individual notice was delivered to over 40,000 potential class members.  Instead, they claim an attorney for the Objectors called Rosenthal and was told she was not a class member.  Rosenthal disputes this, and states that after the MDL lawyer apparently provided a false first name, the lawyer refused to give Rosenthal an address where the claims administrator could mail a notice and claim form.  The Objectors' lawyer then ended the call by informing Rosenthal that she was not a class member in need of the offered notice and claim form.  (*See* Rosenthal Decl. ¶ 15.)  At no time would any member of Rosenthal have stated to a caller that there was a list of class members or that they were not a member of the class. (*Id.*)  That is so because there is no "list" of class members' names.  (*Id.*)  The only information Mobile Messenger had are cell phone numbers and emails of customers who had contacted it and provided an email address, each of whom were emailed notice.

Misunderstanding the scope of the notice, Objectors draw a false comparison between the notice plan in *Greenfield v. Villager Industries, Inc.*, 483 F.2d 824 (3d Cir. 1973) and the above-described plan.  Here, not only was the breath of the publication notice <u>three</u> times that considered by the Court in *Greenfield*, it also was supported by a widely distributed press release, a targeted internet advertising campaign, and direct emails.  As such, the objection is misplaced.

<b>B.      <u>The Issuance of a Press Release is Proper Notice in a Class Action</u></b>

Objectors next speculate that the press release distributed by Rosenthal is not an adequate form of notice to protect the Due Process rights of the class members.  The Objectors presume

the press release's language was improper or that no news outlet actually ran the release.  First, speculative attacks on the likelihood of press releases being picked up for publication have been rejected.  *See Greebel v. FTP Software, Inc*., 939 F. Supp. 57, 62 -63 (D. Mass. 1996) (finding a press release distributed on the Business Wire satisfied the PSLRA, 15 U.S.C. § 78 *et seq.*'s requirement that "widely circulated" publication be given to the class).  Further, as noted above the average distribution of a Business Wire press release reaches approximately 25,000 destinations including internet sites, trade publications and newspapers.  (Rosenthal Decl. ¶ 8)  In fact, the press release here was pick up by several prominent outlets.  (Edelson Decl. ¶ 25.)  The Objectors unsupported assertions concerning the press release should therefore also be discounted.

### C.    Rosenthal's Created A Targeted Advertising Plan Using the Allotted $25,000

Objectors next suggest that Rosenthal may never have spent the agreed amount of targeted advertising money and that allowing Rosenthal discretion in the advertising plan was improper.  The opposite is true.  Not only did Rosenthal use virtually the entire budget, it devoted significant resources to ensure that the advertising was done as successfully and precisely as possible.

Again, Rosenthal is an expert in the administration and marketing of class action settlements.  (Rosenthal Decl. ¶¶ 1-3.)  Rosenthal was specifically retained to develop prepare a notice program designed to reach as many class members as possible.  (Rosenthal Decl. ¶ 4.)  To that end, Rosenthal was given flexibility to determine which marketing strategy would reach the most potential class members with the $25,000 budget allotted in the Agreement.  Consistent with these goals, Rosenthal developed an internet advertising plan seen by over 175 million people, which contributed to bringing over 60,000 visitors to the settlement website.  (Rosenthal

Decl. ¶¶ 9-10.)  As of November 11, 2008, Rosenthal had used $22,500 and will continue to run such promotions through the close of the claims period.  (Edelson Decl. ¶ 28.)  Accordingly, the Objectors' arguments are misplaced.

### D.      The Notice Need Not Have Stated AT&T Was Enjoined From Proceeding with Claims Having no Bearing on the Present Suit

The Objectors claim that the notice to the class is defective under Rule 23(c)(2) (B)(vii) for improperly articulating "the binding effect of a class action judgment" on the class member because it fails to state that AT&T is enjoined from proceeding with the settlement of claims related to mobile content marketed by Jamster or VeriSign.  As those claims are neither related to nor released by the instant settlement, for the reasons explained in Class Plaintiffs' Opposition to Intervention and Motion to Strike these objections, *Gray* Dkt. 29-30, the Objectors' argument lacks merit (and would have a counterproductive effect of resulting confusion amongst class members).

### E.      The Notice Provides Clear Instructions for Determining Class Membership

Proposed objectors next claim that it is impossible for a person to determine if they are a member of the class because the notice states (accurately) that class members' bills may not list the charge as being associated with Mobile Messenger but instead from one of its mobile content provider clients and/or with a description of the charge.  The Objectors, however, fail to apprise the court that the notice and corresponding claim form offer a simple solution to the problem: the notice directs class members to a list of "short codes"—the identifiers that always accompany a mobile content charge on a cellular phone bill—to compare with offending charges on their wireless bills.  (*See* Edelson Decl. ¶ 29.)  For those class members who still had difficultly, the notice stated that such information could be obtained by calling the claims administrator, the

appropriate wireless carrier, or Mobile Messenger.  Accordingly, the notice in fact provides a straightforward method of determining class membership.

## VI.     THE OBJECTORS' OTHER OBJECTIONS LACK MERIT

Although the Court should strike the Objectors' objections for the reasons put forth in the Motion to Strike, *Gray* Dkt. 29-30, each of the objections not addressed above nonetheless lack merit and should in no way dissuade this Court from granting final approval.

### 1.     The Claims Process Was Modeled After The Florida Attorney General's Claim Process In A Mobile Content Settlement With AT&T And Requires Class Members To *Identify* Contested Charges—Not *Bear* The Burden Of Proving They Were Unauthorized.

The Objectors falsely assert that the settlement was designed to make filing claims difficult and that the claim form improperly shifts the burden to the Class to prove the claim is unauthorized.  First, the claim process was specifically modeled after a substantially similar claim process designed by the Florida Attorney General in a settlement with AT&T Mobility over allegedly unauthorized subscription charges for mobile content.  (Edelson Decl. ¶ 30.) There, as here, the claim form requests that class members *identify* which specific charges they are claiming are unauthorized.  (Edelson Decl. ¶ 31.)  The reason class members are required to identify which charges they believe are unauthorized is simple: as even the Objectors acknowledge, wireless customers often have numerous charges for mobile content on their bills, only some of which are unauthorized.  If not for the requirement that class members identify which of potentially several charges they did not authorize, it would be an impossible task for the claims administrator or Mobile Messenger determine the charges at issue.  Further, the information aids Mobile Messenger in ascertaining the mobile content provider associated with the charge and allows it take preventative measures.

The notice additionally provided the contact information for both Rosenthal's call center

and for Class Counsel, each of which would have walked the caller through the process.  Further, the parties were correct in anticipating that by suggesting in the notice that class members contact their wireless carries—who routinely ask for the same information requested on the claim form when processing a refund—that substantial refunds would be provided to the class by the carriers and passed down in the normal course of business to Mobile Messenger.  In fact, the claim form process was envisioned as a back-up for class members who were unable to get refunds through customer service.  Accordingly, both the claim process and claim form are reasonable and Objectors' objections to the contrary are without merit.

>   2.   **The Amount Recoverable by the Class is Significant**

As detailed above, the relief to the class provided under the settlement is substantial and approaches a full victory at trial.  The Objectors take issue with this truth only by mischaracterizing the three-month limitation on subscription refunds.  The Agreement does not, as Objectors would have the Court believe, limit recovery to three months of *all* subscription charges, but to three months of *each* subscription charge.  (*Gray* Dkt. 15-2, p. 16.)  Beyond the plain language of the notice and the Agreement, the claim form itself has five lines for separate subscriptions and invites class members to add additional pages if they have even more subscriptions they claim were unauthorized.

Similarly, Objectors are completely misinformed about the amount of such charges (claimed to be $1-$5.99) and the resultant amount of potential individual recovery.  In fact, most subscriptions for mobile content associated with Mobile Messenger are $9.99 and can be as much as $19.99.  (Edelson Decl. ¶ 32.)  Therefore, the possible recovery for a single subscription could be as high as $59.97, and where there are multiple unauthorized subscriptions the refund could approach $200.

Objectors further suggest that the amount recoverable under the Agreement is insufficient because it does not provide for the reimbursement of "ordinary" text message charges or for fees associated with early termination fees ("ETF") for having to termination their subscription early to avoid paying such charges.  Both arguments are misplaced.  First, a substantial percentage of ordinary text charges are included as part of the wireless subscribers' service package.  For those who actually incurred ordinary charges, the amounts— five to twenty cents per message—are negligible and would overly complicate the claims process.  As to ETF's, the Objectors offer no evidence that any class members incurred early termination charges as a proximate result of being charged for unauthorized mobile content.  Given that all carriers allow subscribers to block mobile content and that no carrier is immune from the problem of unauthorized charges, it seems unlikely that people would incur such charges.  If someone did have such a claim, the proper thing to do would be to opt-out of the settlement.

### 3. The Class May Properly Contact Mobile Messenger Customer Service to Determine Class Membership and/or Receive an Immediate Refund

The Objectors' object that it is improper for the notice to provide the option of calling Mobile Messenger customer service because it has an incentive to suppress claims and results in class members speaking with the defendant absent the presence of counsel.  Both objections misunderstand the purpose of having the class contact Mobile Messenger.  First, however, the notice does not direct class members to call Mobile Messenger's *counsel or some other nefarious character* looking to gather information to be used against the class; rather, they may call customer service and speak with a trained representative like any other customer.  (*See* Sege Decl. ¶ 3.)  Mobile Messenger's customer service representatives are instructed to truthfully determine if a caller was class member and upon such a determination to offer a refund in lieu of filing a claim form.  (*See id.*)  As noted above, such calls resulted in $13,142 being refunded to

the class.  (Sege Decl. ¶ 5.)

**4.     The Agreement Provides a Fair and Reasonable Method for a Class Member to Challenge the Denial of a Claim.**

Next, the Objectors grossly mischaracterize the appeal process implicated in the unlikely situation a colorable claim is denied.  First, the Agreement is clear that approval of claims is based on "a totality of the circumstances and [Rosenthal] shall have the right to request additional information from the Claimant." (*Gray* Dkt. 15-2, p. 18.)  The Agreement then clearly provides that Rosenthal can look at the class member's total mobile content purchase history, including 11 specifically defined factors, if there is any question as to whether the class member has in fact authorized the charges in question.  (*Id.*)  Further, the Objectors are simply wrong that the *indicia* always support the denial of the claim, as the frequency of the charges supports that the charge was unauthorized.

Finally, Objectors deliberately take words out of context to create the false impression that Class Counsel would challenge the *approval* of a claim form.  Reading the complete and surrounding sentences makes clear that Class Counsel and Mobile Messenger have the right to challenge Rosenthal's decision as to any particular claim form.  (*Gray* Dkt. 15-2, p. 18-19.)  As such, the Objectors' objections are properly denied.

**5.     The Release Is Both Clear And Narrow, Extinguishing Claims Only For Mobile Messenger–Related Charges**

In an obvious attempt to portray the release provided in the Agreement to the Court in a manner as confusing as possible, the Objectors only expose their apparent lack of understanding of the Agreement and the mobile content industry.  The Amended Stipulation, like all settlement agreements, uses complex terms to express a relatively simple outcome: if the Court grants final approval to the settlement, Mobile Messenger, its Mobile Content Provider clients, the

aggregators used by Mobile Messenger for carrier interconnections, and the wireless service providers who actually billed the wireless subscribers will each receive a release from the Class Members limited to all claims for unauthorized mobile content charges associated with Mobile Messenger.  The defined terms of the Agreement and the class definition clearly limits the release of claims involving non-parties only for mobile content associated with mobile messenger.  This is further driven home by the class definition, which is similarly limited to individuals who received Mobile Messenger charges.  Explaining the structure of mobile content industry to class in the notice would be more confusing than useful as even Objectors' counsel apparently has trouble understanding the basics of this complex industry.  Accordingly, the Court should not be fooled by Objectors' attempt to muddy what is essentially a clear and narrow release of claims for unauthorized mobile content charges associated with Mobile Messenger.

### 6. Class Representative Gray Adequately Represents the Class Members in Settling the Claims Being Released in the Agreement

The Objector's final objection to the proposed settlement is that the Agreement cannot be approved because it releases claims against non-parties against whom Gray may not have claims.  In making this objection, the Objectors ignore the clear factual record of this case.  As found by this Court when certifying the Class and appointing the Class Representative, Gray "and the proposed class members were allegedly equally charged for unauthorized mobile content associated with Mobile Messenger as a result of a common course of conduct." (*Gray* Dkt. 16, ¶¶ 6-7.)  The case involves only the content associated with Mobile Messenger and it is entirely irrelevant the non-defendant wireless network used by the class member.  In this settlement unauthorized charges associated with Mobile Messenger content is **refunded in total** whether a class member was a Sprint customer, an AT&T customer or a Verizon Wireless customer like Gray.  Class Representative Gray is identically situated to every other class

member in this action in every way regardless of which carrier charged for the unauthorized

mobile messenger content.  Thus, the release of claims in the Agreement is entirely proper as

"class action settlements have in the past released claims against non-parties where, as here, the

claims against the non-party being released were based on the same underlying factual predicate

as the claims asserted against the parties to the action being settled."  *Lipuma*, 406 F. Supp. 2d at

1317 (quoting *Wal-Mart Stores, Inc. v. VISA U.S.A., Inc.*, 396 F.3d 96, 109 (2d Cir. 2005)).[14]

The Objectors further ignores the well-established case law and even the legal

prerequisites of their own cited authority by failing to demonstrate (or even allege) a conflict

between the customers of the different carriers or even raise a single issue relevant to the creation

of subclasses.  The Objector quotes *Amchem Products, Inc. v. Windsor,* for the now universally

recognized proposition that the class representative must, "possess the same interest and suffer

the same injury" as the other class members.  While accurately stating hornbook law, the

Objectors simply ignore the fact that Gray has an identity of interest and injury with the class and

unlike *Amchem* all class members are being treated the same.  It simply cannot be said that the

*Amchem* class that included two groups with wholly different asbestos injuries was in anyway

analogous to the facts in this case.  *See* 521 U.S. 591, 626-627 (1997); *see also In re General*

*Motors Corp. Pick-Up-Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 800-804 (3d

Cir. 1995) (reasoning that the interest of class members who were individual owners did not

adequately represent the interests of all members of the class and have been antagonistic to fleet

owners included in a single class).  Here, Gray has the same interest as the rest of the class to

---

[14] In fact *Lipuma* specifically distinguished the primary authority relied upon by the objector, *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981), in a manner relevant here.  Since *Super Spuds* concerned a settlement that released claims that were in no way related to the claims actually litigated, *Lipuma* found, "[T]he proposed settlement was not approved because it released claims arising from purchases of unliquidated futures contracts, although the only claims presented and noticed were of plaintiffs who had purchased liquidated futures contracts."  *Lipuma*, 406 F. Supp. 2d at 1318 (distinguishing *National Super Spuds*).

recover a refund of the money that was paid for unauthorized charges processed by Mobile Messenger.

Each case cited by Objectors is also distinguished by a simple truth—that Gray brought this class action against a single Defendant: Mobile Messenger.  The released non-parties (wireless carriers, other aggregators, mobile content providers), are related to Mobile Messenger and the claims of the class because each was simply a conduit for the delivery of the unauthorized mobile content associated with Mobile Messenger.  To the extent the released non-parties have liability to the class for unauthorized mobile content charges not related to Mobile Messenger, the release does not extend to such claims.[15]  Accordingly, the objection lacks merit and should be rejected by the Court.

> **7.    The Objectors Remaining Non-Substantive Objections Should be Ignored or Can Be Addressed at Final Approval if Not Stricken**

Throughout their lengthy and scattershot objection, the Objectors make numerous additional personal attacks, irrelevant comments, and non-substantive arguments that, if the Court so inclines, can be addressed by Class Counsel as part of the final approval process

## VII.   THIS COURT SHOULD AWARD THE AGREED-UPON ATTORNEYS FEES OF $1,225,000.

> **1.    The Requested Fees Were Negotiated and Agreed to Only After an Agreement-in-Principle was Reached with Respect to Class Relief.**

Courts strongly encourage negotiated fee awards in class action settlements.  *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorneys' fees should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of the fee."); *accord Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) ("where, as here, the parties have agreed

---

[15] *La Mar v. H&B Novelty & Loan Company*, 489 F.2d 461 (9th Cir. 1973) also offers no support for the objection.  There, the court was confronted with a plaintiff who did business with a single Oregon pawnbroker, yet brought a class action against a wholly unrelated group of other pawnbrokers who had engaged in similar conduct.  *La Mar*, 489 F.2d at 462.

on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference.")  Courts have recognized the benefits these agreements provide in that they assure defendants of their maximum exposure and shield the Plaintiffs from being "sandbagged," especially where the settlement was free of collusion.  *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293, n. 4 (11th Cir. 1999) (quoting *Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985), *abrogated on other grounds, Amchem*, 521 U.S. 591) (citing *Hensley*, 461 U.S. at 437).  Here, the parties agreed to the negotiated amount only after an agreement-in-principle was reached with respect to class relief only after considering and debating what the Court was likely to award.  As shown below, the negotiated fee is well within the range of reasonableness, and should be approved.

>    **2.      Class Counsel are Entitled to a Percentage of the Value of the Settlement.**

In a settlement such as this, class counsel are "are entitled to compensation for their services from the common fund," with the amount being subject, of course, to court approval. *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991); *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194-95 (6th Cir. 1974); *see also In re Sunbeam*, 176 F. Supp. 2d at 1333 (a "litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.") (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)).  This rule is rooted in the premise that those who receive the benefits of a settlement or judgment are unjustly enriched by the time, effort and energy expended by the successful litigant and attorneys.  *Boeing*, 444 U.S. at 478; *Mills v. Elec. Auto-Lite, Co.*, 396 U.S. 375, 392 (1970).  Further, this doctrine recognizes both the need to encourage lawyers to pursue cases aimed at redressing wrongs inflicted upon entire classes of people and discourages future misconduct by Defendants and others.  *Mashburn*

*v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988); *see Deposit Guaranty Nat'l Bank v. Rope*; 445 U.S. 326, 338-39 (1980); *Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).

The Eleventh Circuit set the standard in *Camden I*, where it held "Henceforth in this circuit, attorney's fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." 946 F.2d at 774; *see also Allapattah*, 454 F. Supp. 2d 1185, 1201 (S.D. Fla. 2006). The analysis is relatively straightforward: whether a proposed fee represents a reasonable percentage of the class benefit requires weighing the twelve "*Johnson* factors" 946 F.2d at 774 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)), which allow the Court, based on the circumstances of the case, to determine the reasonableness of the request. As demonstrated below, applying them here reveals the fee requested is reasonable to the class, the litigants, and the Court.

**3.     The Requested Fees Represent Approximately 10% of the Cash Relief Made Available to the Class.**

In considering the percentage of the common fund, the Court should first look at the amount of the fees requested in relation to the total settlement benefits conferred, regardless of whether those benefits are actually claimed. *See, e.g.*, *Boeing*, 444 U.S. at 480 81; 2 Newberg on Class Actions § 1.18 (3d Ed.1992) ("[I]t is now settled that class counsel may seek a fee award based on the total potential benefit to the class, rather than being limited by the total amount of claims actually exercised by class members"); *accord Stahl v. Mastec, Inc., et. al.*, No. 8:05-CV-1265-T-27TGW, 2008 WL 2267469 at *1 (M.D. Fla., May 20, 2008) (citing *Boeing* and *Waters* for the proposition that "it is appropriate that the attorneys' fees be awarded on the entire Maximum Gross Settlement Amount even though amounts to be paid to settlement class

members who do not file a claim form will remain the sole and exclusive property of the

defendant.")

The total settlement benefits here include not only the $12 million in monetary benefits

but also the non-monetary relief as well.  *Hall v. Cole*, 412 U.S. 1, 5 n. 7 (1973) (noting the

common fund doctrine "must logically extend, not only to litigation that confers a monetary

benefit on others but also litigation 'which corrects or prevents an abuse which would be

prejudicial to the rights and interests of those others.'" (quoting *Mills*, 396 U.S. at 396); *see also*

*Camden I*, 946 F.2d at 775.  In a sense then, "common fund" is somewhat of a misnomer in that

the full benefit to the class is to be considered.  *Elkins v. Equitable Life Ins. Co.*, No. 96-296-CV-

T-17B, 1998 WL 133741, at *32 (M.D. Fla. Jan. 28, 1998) (finding the court includes non-

monetary benefits in valuing a common fund).

In addition to the cash component, Mobile Messenger is required to abide by strong

injunctive relief, to significantly decrease the incidents of unauthorized charges.  Without

assigning them a specific dollar value, it is clear they will save Class Members significant sums

of money in the future.  This means that the $12 million cash component is most properly viewed

as the floor when valuating the settlement benefits.  The agreed-upon fees, thus, represents

approximately 10.2% of the lowest value of the settlement. As explained below, this percentage

is modest and reasonable in light of the *Johnson* factors.

    **4.**    **A Fee Reflecting Less Than 10.2% of the Benefit Provided to the Class is
More than Reasonable in Light of the *Johnson* Factors.**

The twelve *Johnson* factors, analyzed in turn, are:  (1) the time and labor required; (2) the

novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal

service properly; (4) the preclusion of other employment by the attorney due to acceptance of the

case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations

imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Camden I*, 946 F.2d at 772 n. 3. Each show that the percentage requested is modest and reasonable.

A.   <u>The time and labor required supports the requested attorneys fees</u>.

Class Counsel's lodestar to date, which does not take into account any appeals, preparing for the Final Approval hearing, responding to Class Member inquiries, and assisting after final approval with settlement administration, totals $506,845.50, exclusive of costs. (Edelson Decl. ¶ 38.) This amount reflects time a team of lawyers spent researching, filing, litigating, negotiating and ultimately settling this matter against a well-financed corporation. (Edelson Decl. ¶ 34.) Given this time, the percentage requested reflects a mere multiplier of 2.147. *See Behrens*, 118 F.R.D. at 549, *aff'd*, 899 F.2d 21 (11th Cir.1990) (recognizing appropriate lodestar multipliers between 3 and 4.) Class Counsel also incurred expenses of $11,602.48. (Edelson Decl. ¶ 39.)

B.   <u>The novelty and difficulty of the questions involved supports the fee request</u>.

So far as consumer class actions go, unauthorized mobile content cases are rather complex. Without in any way understating other types of litigation, each of which present diligent practitioners with unique challenges, demands for thoroughness, and opportunities for creativity, Class Counsel faced no easy task here. Class Counsel was required to build in depth knowledge of a young industry experiencing rapid growth, including performing research into the programming and technology behind mobile content and cellular telephones, the relationships between the key players that bring premium mobile content from the development stages to the end customers, the billing systems and profit-sharing arrangements these companies

employ, the tactics used to bill for unauthorized mobile content, and the industry standards and efforts to combat unauthorized mobile content billing.

Moreover, Class Counsel had to contend with procedural difficulties, including crafting a settlement that adequately addresses the problems of unauthorized mobile content, compensates class members financially, and pays due respect for a new industry's need for flexibility.  This is not to mention the realities of defending a settlement against the arguments raised by professional objectors, whose status as MDL Plaintiffs, albeit in unrelated litigation, added layers of complexity to an already difficult set of issues.  There were also the complexities of dealing with other settlements that had been reached with industry participants (i.e., *McFerren v. AT&T Mobility*) so as to disallow double recoveries.  All in all, this litigation was sufficiently novel and difficult to support the fees requested.

**C.      Class Counsel demonstrated the skill requisite to perform the legal service properly**

In addition to the research and investigation described above, Class Counsel is experienced in this type of litigation, having focused much of its practice on consumer protection class actions generally, and third party mobile content charges in particular.  (Edelson Decl. ¶ 15.)  Class Counsel announced the first major settlement against a wireless carrier, AT&T Mobility, for unauthorized charges.  (*Id.*)  The instant settlement itself is the first of kind against an aggregator, which presented difficulties in that no tested model existed from which to base the settlement's framework.  (Edelson Decl. ¶ 33.)  This factor weighs in favor of finding the settlement percentage reasonable.

**D.      The preclusion of other employment by the attorney due to acceptance of the case supports the fees requested**.

Due to the substantial time devoted to this case by the KamberEdelson law firm, the attorneys were unable to accept other cases.  (Edelson Decl. ¶ 34.)  This is generally applicable in all cases, and it is true here as well.  This factor weighs in favor of the requested fees.

### E.     The fees requested are less than those customarily awarded in similar cases.

These rates are comparable to or less than those typically paid to both defense counsel and plaintiffs' firms in similar types of sophisticated cases.  (Edelson Decl. ¶ 37.)  As a result, Class Counsel's lodestar comports with the standard fee amount found in the marketplace for nationwide class actions of this nature.  *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992) ("The object in awarding a reasonable attorneys' fee…is to simulate the market.").  In fact, it would appear that Plaintiffs' lodestar here would result in a lower fee than a private individual contingency fee agreement, where the attorney likely would receive 30%-40% of the value of the recovery, including any injunctive relief.  *See, e.g. Blum v. Stenson*, 465 U.S. 886, 904 (1984); *Kirchoff v. Flynn*, 786 F.2d 323, 325 n. 5 (7th Cir. 1986).  Furthermore, had the decision for fees been left to this Court to decide, Class Counsel would have been within their right to justify a reasonable fee totaling 20-30% of the settlement benefits—equaling as much as $3.6 million—as opposed to the $1,225,000 requested.

### F.     The requested fee's contingent nature and the circumstances surrounding the settlement support the conclusion the request is reasonable

The fact that the fees sought are contingent in this case weighs in favor of approving the requested fee award.  *See Behrens*, 118 F.R.D. at 541; *see also In re Sunbeam*, 176 F. Supp. 2d at 1335 ("A contingency fee arrangement often justifies an increase in the award of attorneys'

fees"). The award's contingent nature provided an incentive for Class Counsel to litigate efficiently. [16]

Additionally, as described above, the contingent nature of the fees presented enhanced risks given that no other law firm had ever reached a settlement with an aggregator for unauthorized mobile content, as the industry is both rapidly growing and changing. Accordingly, these factors further support the reasonableness of the fees.

### G.  The fee request is reasonable in light of the amount involved and the results obtained.

As detailed above, the present request for attorneys' fees is entirely reasonable in light of the extraordinary benefits provided to the class under the Agreement, including virtually full refunds to be paid from a $12 million fund, the substantial injunctive relief, and Mobile Messenger's agreement to pay for the costs of notice and claims administration. Accordingly, the requested fee percentage is reasonable.

### H.  The experience, reputation and ability of the attorneys suggest the fee is reasonable.

The time spent and the rates sought by Class Counsel are commensurate with the practice skills and experience of the particular attorneys who performed the work. (Edelson Decl. ¶ 37.) Class Counsel are dedicated to consumer class action cases, especially those involving new technologies, and have been the first to structure settlement agreements for cramming cases against wireless carriers, aggregators, and content providers. (Edelson Decl. ¶ 15.)

---

[16] This approach promotes the deterrence goals of class actions. *See* Hailyn Chen, Attorneys' Fees and Reversionary Fund Settlements in Small Claims Consumer Class Actions, 50 U.C.L.A. L. REV. 879, 892 (2003) ("Limiting class counsel to a fee based on a percentage of what class members actually claim will, in many instances, result in a fee that is so small as to prevent class action attorneys from pursuing such cases...."); 7b Wright, Miller, And Kane, Federal Practice & Procedure, § 1803.1 at 369 (3d ed. 2005) ("If counsel did not have the prospect of an award that took account of the risks and uncertainties, the necessary incentive would be lacking and a major weapon for enforcing various public policies would be blunted.").

**I.     The "undesirability" of the case**.

Defendants such as Mobile Messenger are sophisticated and, given the relative youth of the mobile content industry were prepared to vigorously defend the claims asserted here.  Putting aside the difficulties inherent in any class action litigation, victory in this case was not certain in the slightest.  Mobile Messenger had strong class related arguments as well as a myriad of carrier-customer arbitration agreements it could have sought to enforce at its disposal. Accordingly, Class Counsel took a relatively tremendous risk in their effort to give Plaintiff Gray her "day in court" and this factor also weighs in favor of approving the requested fees.

**J.     The nature and length of the professional relationship with the client does not militate in favor or against the requested fees**.

This factor does not weigh in favor or against the requested fee.  Plaintiff Lisa Gray is one of thousands of cell phone users who have contacted KamberEdelson to complain about unauthorized mobile content.  The settlement provides Ms. Gray with a fair incentive award (described below) but the nature of the professional relationship does not inform the fee discussion here as greatly as it may in other cases.

**K.     Awards in similar cases suggest the fees requested her are on the low end of what is typically considered reasonable**.

As explained above, similar cases apply benchmarks near 25% of the total settlement benefit.  When all is said and done, Class Counsel's duty is to the class members.  Class Counsel here has thus resisted the temptation often present in class action settlements to allow greed to triumph over sound class benefits.  Though the requested fee is smaller than a standard percentage would allow, the fees are reasonable under all the circumstances described above, and, as a result, should be approved.

## VIII.   INCENTIVE AWARD

This Court and others have found it appropriate to award named class Plaintiffs for the benefits they have conferred.  *See Allapattah*, 454 F. Supp 2d at 1218-19 (S.D. Fla. 2006); *In re Dun & Bradstreet Credit Services Customer Litig.*, 130 F.R.D. 366 (S.D. Ohio 1990) (awarding two incentive awards of $55,000, and three incentive awards of $35,000); *Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27 (E.D. Pa 1985) (awarding incentive awards of $20,000 to each of two Plaintiffs).  As explained in *Allapattah Services Inc. v. Exxon Corp.*:

> While the Eleventh Circuit has not set forth guidelines for courts to use in determining incentive awards, there is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action.  In fact, 'courts routinely approve incentive awards to compensate named Plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'

454 F. Supp. 2d at 1218-19 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga 2001).

In this case, the Class Representative's involvement in this action was critical to the ultimate success of the case, working with Class Counsel in its investigation of her claims and those of the class.   But for her participation and willingness to undertake the responsibilities and risks attendant with bringing a representative action, the successful resolution of this dispute may have been greatly hampered.  Plaintiff therefore requests the Court approve agreed-upon incentive award of $1,000 as reasonable.

## IX.   CONCLUSION

For the reasons stated above, the Plaintiff respectfully requests this Court grant final approval of the Class Action Settlement Agreement with Mobile Messenger Americas, Inc., awarding Class Counsel reasonable attorney's fees and expenses in the amount of $1,225,000,

award an incentive payment to Class Representative Lisa Gray in the amount of $1000 and grant

such additional relief as the Court deems reasonable and just.

Respectfully submitted,

Dated: November 14, 2008                /s/ David P. Healy_____ _____
                                        David P. Healy (0940410)
                                        2846-B Remington Green Cr.
                                        Tallahassee, FL 32308
                                        (850) 222-5400
                                        (850) 222-7339 (fax)
                                        dhealy@nettally.com


                                        /s/ Ryan D. Andrews_____ _
                                        Jay Edelson
                                        Myles McGuire
                                        Ryan D. Andrews
                                        jedelson@kamberedelson.com
                                        mmcguire@kamberedelson.com
                                        randrews@kamberedelson.com
                                        KAMBEREDELSON, LLC
                                        350 North LaSalle, Suite 1300
                                        Chicago, IL 60654
                                        T: 312.589.6370
                                        F: 312.913.9401

                                        *On Behalf of Plaintiffs and the Class*

<u>**Certificate of Service**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed with the Clerk using the CM/ECF system which will cause a copy to be sent electronically to the following persons on November 14, 2008:

                                     _/s/ David P. Healy_____
                                     David P. Healy


Charles A. Wachter
Edward M. Waller, Jr.
Julie S. Sneed
cwachter@fowlerwhite.com
ewaller@fowlerwhite.com
jsneed@fowlerwhite.com
Fowler White Boggs & Banker, P.A.
501 E. Kennedy Blvd., Suite 1700
P.O. Box 1438
Tampa, FL 33601
t. 813.228.7411
f. 813.229.8313
*Attorneys to Defendant Mobile*
*Messenger Americas, Inc.*

Philip F. Atkins-Pattenson
patkinspattenson@sheppardmullin.com
Sheppard Mullin Richter & Hampton, LLP
Four Embarcadero Center, 17th Fl.
San Francisco, CA 94111-4109
t. 415.774.2933
f. 415.403.6021
*Attorneys to Defendant Mobile*
*Messenger Americas, Inc.*

Patrick E. Geraghty
pat@7-litigator.com
Geraghty, Dougherty & Edwards, P.A.
2075 W. First Street
Ft. Myers, FL 33901
t. 239.334.9500
f. 239.334.8930

*Local Counsel for In re Jamster*
*Marketing Litigation Plaintiffs CHARLES*
*FORD, DEBRA SZALANSKI, CAROL FOX*
*DE STEFANO, DAVID HASLET, GERALD*
*SHUCK, LLOYD PAGE, RADNY CHUNN,*
*SANDRA GILES, CHRISTINA HALL, ERIGHT*
*JOHNSON, DIANE CERVANTES,* and *BARON HARMON.*

Dewitt M. Lovelace
dml@lovelace.com
Lovelace Law Firm, P.A.
36474 Emerald Coast Parkway, Suite 4202
Destin, FL 32541
t. 850.837.6020
f. 850.837.4093
*Counsel for In re Jamster*
*Marketing Litigation Plaintiffs CHARLES*
*FORD, DEBRA SZALANSKI, CAROL FOX*
*DE STEFANO, DAVID HASLET, GERALD*
*SHUCK, LLOYD PAGE, RADNY CHUNN,*
*SANDRA GILES, CHRISTINA HALL, ERIGHT*
*JOHNSON, DIANE CERVANTES,* and *BARON HARMON.*